WRIGHT, J., DISSENTING:
I respectfully dissent from the majority and would reverse the Court of Appeals and reinstate the Knott Circuit Court's judgment. I fully agree with the majority's excellent analysis of the law but must dissent based on the facts of the case. The jury had sufficient evidence to support their determination that CONSOL Energy, Inc., ("Energy"), interfered with the contractual relationship between its wholly-owned subsidiary and Appellant. The interference violated the economic interest of the subsidiary and used wrongful means.
The majority correctly holds that "[t]his Court has always followed the Restatement (Second) of Torts (1979) approach to tortious interference claims.... Section 769 of the Restatement (Second) of Torts provides that a third party who has a financial interest in the business of another may interfere with the contractual relations of that business if he '(a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation.' " The majority cites several cases from our sister states that hold this provision to mean that a parent corporation does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest unless the parent corporation employs wrongful means or acts with an improper purpose. Waste Conversion Sys., Inc. v. Greenstone Indus. Inc., 33 S.W.3d 779 (Tenn. 2000), Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029 (2d Cir. 1995), Phil Crowley Steel Corp. v. Sharon Steel Corp., 782 F.2d 781 (8th Cir. 1986), MGP Ingredients, Inc. v. Mars, Inc., 465 F.Supp.2d 1109 (D. Kan. 2006).
The majority holds "that a parent corporation has a privilege to interfere in the contractual relations of its wholly-owned subsidiary, unless it employs wrongful means or acts contrary to its subsidiary's interests." First, let us examine whether directing the subsidiary corporation to breach its contracts with Appellant was in the subsidiary's economic interest. There was sufficient proof for the jury to find that the Appellant's contracts were terminated because an employee of Energy was having a sexual affair with Little, an employee of Appellant, who was given the contracts the day after Appellant's contracts were terminated.
Testimony was presented that Little told Minister Cecil Leo Slone that she had slept with the main boss to get the Appellant's job. Does the subsidiary gain any economic benefit by terminating contracts so that the contracts can be immediately awarded to a woman because she was having a sexual affair with one of Energy's employees? No. Instead of an economic benefit, the subsidiary was found liable for breach of contract and damages of $ 34,500 were ordered against it. These damages were upheld by the Court of Appeals and were not appealed to this court.
The reason for Energy to interfere with its subsidiary's contracts was that its employee, in a powerful boss position, was *574 having a sexual affair with the woman. Energy then gave the same contracts to the woman having a sexual affair with one of its bosses the day after it terminated Appellant's existing contracts. What economic benefit was gained by terminating the Appellant's contracts and awarding the same contracts to the woman having a sexual affair with one of the bosses? Energy's interference with Appellant's contracts fails to provide any economic benefit to Energy or its subsidiary. The consequence of Energy's interference with its subsidiary's contracts was that the subsidiary was liable for breach of contract, had to pay damages of $ 34,500 and incurred substantial litigation costs. Energy's interference with its subsidiary's contracts was obviously without any benefit and was a violation of the subsidiary's economic interest.
The next issue is whether Energy used improper means to interfere in its subsidiary's contracts. Again, I agree with majority's analysis of the law that a parent corporation may interfere with a subsidiary's contracts,
but recognizing an exception when the plaintiff proves improper motive or improper means; Phil Crowley Steel Corp. v. Sharon Steel Corp., 782 F.2d 781, 783 (8th Cir. 1986) (Missouri law dictated that a parent corporation may interfere with its subsidiary's contractual relations unless the parent employs wrongful means or acts for an improper purpose); MGP Ingredients, Inc. v. Mars, Inc., 465 F.Supp.2d 1109, 1115 (D. Kan. 2006) ("parent corporation cannot be held liable for tortious interference when it directs its wholly-owned subsidiary to breach a contract that [ ] is no longer in the subsidiary's economic interest to perform unless the parent corporation employs wrongful means or acts with an improper purpose[ ]"); T.P. Leasing Corp. v. Baker Leasing Corp., 293 Ark. 166, 732 S.W.2d 480, 483 (1987) ("a parent corporation's privilege permits it to interfere with another's contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose[ ]").
Is it a wrongful means or improper purpose for Energy to interfere with its subsidiary's contracts to provide income and advancement for a woman because she was having a sexual affair with one of Energy's powerful boss employees? In this age of the #metoo movement, it is difficult to understand how the court could find that financial advancement for a woman and discrimination against a man because the woman is having a sexual affair is anything but a wrongful means or an improper purpose.
The wrongful means or improper purpose is established by the fact that sexual discrimination is a violation of federal and state law. Kentucky adopted its own version of the federal Title VII-Equal Employment Opportunity. As we have stated:
One important purpose of the Kentucky Civil Rights Act was to incorporate the anti-discrimination "policies embodied" in the Federal Civil Rights Acts of 1964 (P.L. 88-352, Title VII-Equal Employment Opportunity) as amended. See KRS 344.020(1)(a). It is Title VII of the Federal Civil Rights Act of 1964 which addresses employment discrimination based on "race, color, religion, sex, or national origin." But there are further purposes expressed in the Kentucky statute not specified in the Federal, including "protect [ing] ... personal dignity and freedom from humiliation." KRS 344.020(1)(b).
*575 Meyers v. Chapman Printing Co., 840 S.W.2d 814, 817 (Ky. 1992). Suits against employers under both the federal and state laws have succeeded when employers have ignored and allowed discriminatory practices, sexual harassment, and the creation of a hostile work environment.
In this case, the complaint comes from the man who was discriminated against rather than the woman. This is of no consequence. Both the federal and state laws make it clear that they apply equally to both sexes. Whether it is a man or a woman, discrimination is discrimination. Further, the fact that the woman has not yet filed a complaint does not rule out the possibility of her realizing in the future that she was abused through these workplace dealings, and then taking action at a later time. We constantly see news accounts of women who were sexually harassed years ago later having a strong need to speak out against the abuse-often in spite of the fact they had received benefits from their job or settlements in which they signed nondisclosure agreements.
The predators who have abused women have used their positions of power, the environment created by the corporations and a large number of enablers (detectives, lawyers, and nondisclosure agreements) to keep their victims quiet so that they can continue to prey on other victims. This has resulted in many victims who suffer for years before they speak out. Will the woman in this case someday speak out and say that she was the victim of abuse? It is impossible for us to know. Whether she does or not, Energy still used the power to interfere in its subsidiary's contracts to reward a woman for having a sexual affair with one of its bosses and discriminated against the man who had a contract with the subsidiary.
Is the discrimination nullified because the discrimination is against the man in this case? Does the man lose his rights because the woman has yet to file a complaint? Is it a proper purpose for a corporation to create an environment where the woman, in Ms. Little's own words, "slept with the main boss to get the Appellant's job?" We must be clear that the answer to these questions is NO!
Therefore, I dissent. I would hold that Energy's interference with its subsidiary's contracts was tortious because it harmed the subsidiary's economic interest by using wrongful means for an improper purpose. I would reverse the Court of Appeals because the jury's findings were supported by sufficient evidence and the Court of Appeals substituted its view of the evidence to vacate the jury's findings and the trial court's judgment. The judgment of the Knott Circuit Court should be reinstated.